UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

MELISSA WIGMORE,

        Plaintiff,

  v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

        Defendant.

Case No. 6:12-cv-0611 -ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Melissa Wigmore ("Wigmore"), seeks judicial review of the final decision

by the Social Security Commissioner ("Commissioner") denying her application for

Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC §§ 1381-1383f.

This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to FRCP 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 USC § 405(g).

§ 405(g) and § 1383(c)(3).  For the reasons set forth below, that decision should be

AFFIRMED.

## ADMINISTRATIVE HISTORY

Wigmore protectively filed for SSI on August 23, 2007, alleging a disability onset

date of March 1, 2007.  Tr. 75, 177-84, 189.[2]  Her application was denied initially and on

reconsideration.[3]  Tr. 79-84.  On January 11, 2010, Administrative Law Judge ("ALJ")

James Yellowtail held a hearing at which Wigmore was represented and testified.  Tr. 54-

74.  On December 3, 2010, the hearing continued, at which Vocational Expert ("VE") Jay

Stutz testified and Wigmore provided limited supplemental information.  Tr. 11, 38-53.  The

ALJ issued a decision on January 7, 2011, finding Wigmore not disabled within the meaning

of the Act.  Tr. 8-22.  On February 2, 2011, after considering Wigmore's additional

evidence, the Appeals Council denied her request for review, making the ALJ's decision the

Commissioner's final decision subject to review by this court.  Tr. 1-4; 20 CFR

§§ 416.1481, 422.210.

## BACKGROUND

Wigmore was born in 1972.  Tr. 177.  She completed high school and one semester

of college coursework.  Tr. 62.  She has no past relevant work but has worked as a cashier,

bartender, and hand packager.  Tr. 20, 43-47.  Wigmore alleges that she is unable to work

due to the combined impairments of panic attacks, social anxiety disorder, and bipolar

disorder.  Tr. 59, 194.

---

[2]  Citations are to the page(s) indicated in the official transcript of the record filed on September 17, 2012 (docket #11).

[3]  Though the parties seem to agree that Wigmore's application was denied both initially and on reconsideration, the record contains no documentation of the reconsideration denial, and the ALJ's decision states only that her application was denied initially.  Tr. 11.

I.     __Medical Records__

The first medical record is dated March 9, 2005.  Tr. 259.  Wigmore reported to Ron

Ballard at the Ozark Center in Missouri that she often lays in bed and sleeps, has very low

energy, avoids people, and has an increased heart rate and difficulty breathing when she

goes out in public.  *Id*.  She reported experiencing "minute to minute" mood changes and

that she had been clean and sober since September 2, 2003.  *Id*.  Ballard prescribed Lexapro

and Seroquel.  *Id*.

On April 12, 2005, Wigmore reported a stable mood, increased comfort around

people, and generally feeling "much better."  Tr. 258.  Ballard renewed Wigmore's Lexapro

and decreased her Seroquel as it made her feel "too sedated."  *Id*.

On January 6, 2006, Tammy Coomer, RN, CNS, completed a psychological

evaluation and diagnosed Wigmore with "bipolar I disorder, most recent episode (or

current) depressed, severe, without mention of psychotic behavior."  Tr. 257.  Wigmore

reported that she cried a lot, had no appetite, poor energy, little motivation, difficulty

concentrating, and experienced manic episodes.  Tr. 256.  She reported losing custody of her

children in 2004 due to methamphetamine addiction, and her middle child was being

adopted.  *Id*.  Coomer noted that Wigmore was dressed appropriately, had regular speech,

and appeared alert, oriented, logical, and sequential, though she stated that she was

depressed and experiencing suicidal thoughts.  Tr. 256-57.  Coomer prescribed Prozac and

Seroquel to decrease Wigmore's depression and mania.  Tr. 257.

When Wigmore next saw Coomer on February 27, 2006, she reported a recent stop

for a DUI, several major panic attacks, and side effects from the Prozac (manic) and

Seroquel (sleepy).  Tr. 255.  Wigmore denied having any problems with alcohol and was agitated and hostile because Coomer would not prescribe Klonopin.  *Id*.

During her next visit on March 13, 2006, Wigmore reported that she was "good" and her mood was stable, but had trouble sleeping.  Tr. 254.  Coomer prescribed Ambien for two weeks to establish a regular sleep pattern.  *Id*.  On March 29, 2006, Wigmore still could not sleep and reported that her medication was not working.  Tr. 253.  She was anxious, irritable, and insistent that Lithium was the only medication that works for her.  *Id*.  Coomer prescribed Lithium and Depakote.  *Id*.

On March 16, 2006, Tanya Klue, BS, Wigmore's case worker at the Ozark Center, completed a Psychosocial Clinical Assessment.  Tr. 279-81.  At that time, Wigmore's treatment goals were to straighten out her medications in order to stabilize her moods and to get her children back.  Tr. 279.  Wigmore reported that she was diagnosed with bipolar disorder at age 15 and that her mood swings are generally well-regulated by her medications.  *Id*.  She reported a history of arrests associated with methamphetamine use between 2001 and 2004, two hospitalizations in 2004 due to depression, and "numerous hospitalizations" since 2004.  Tr. 279-80.  Wigmore reported budgeting well even on her limited income, cooking her own meals, and taking care of her own personal care and hygiene, but felt phobic about being alone and relied on others to do her grocery shopping. *Id*.  Klue diagnosed Wigmore with major depressive disorder, recurrent episode, unspecified, bipolar disorder, and borderline personality disorder.  *Id*.  She assessed a GAF of 50 and found that Wigmore had average intellectual functioning.  Tr. 280.  While pleasant and cooperative during the interview, she kept "her answers short and left out important information discovered later" in the clinic's records.  Tr. 281.  The clinic's

records revealed "numerous hospitalizations and trouble with the legal system with repeated failures to conform to social norms." *Id.* Klue also noted what Wigmore had been described as "deceitful, impulsive, and unreliable." *Id.*

On April 12, 2006, Wigmore reported feeling better on the Depakote, but that the Lithium made her too drowsy. Tr. 252. She was still anxious and struggling with insomnia. *Id.* Coomer continued the Depakote and also prescribed Trazadone. *Id.*

Between May 12, 2006, and November 27, 2007, Wigmore's treatment records at the Ozark Center are unsigned. Tr. 244-51, 312. However, Wigmore reported that she was no longer seeing Coomer because Coomer had been changing her medications and not listening to her input. Tr. 275. During this period, Wigmore continued to report stress and anxiety related to custody of her children, struggles relating to employment, and difficulty securing Medicaid since her children were no longer living with her. Tr. 244-51, 260-74, 312. Her medications were modified to better address her stressors. *Id.*

On October 15, 2007, based on a review of the medical records, Geoffrey Sutton, Ph.D, completed a Psychiatric Review Technique form. Tr. 282-93. He classified Wigmore's medical disposition as falling within Listing 12.04 Affective Disorders due to her bipolar disorder. Tr. 284-85. He concluded that Wigmore had no restriction of her activities of daily living, no repeated episodes of decompensation of extended duration, and only mild difficulties in maintaining social functioning and concentration, persistence, or pace. Tr. 290. He found no evidence to establish the presence of the "C" criteria. Tr. 291. Finally, Dr. Sutton noted that Wigmore's allegations were only "partially credible" because the medical evidence did not support her claim that she has panic attacks whenever she goes out in public and only goes out to see her doctors. Tr. 292. Overall, Dr. Sutton concluded

that Wigmore's bipolar and social anxiety disorder are not severe when she is on her medication and that she suffers from situational depression when off her medication or when her children are taken from her care. *Id*.

On December 17, 2007, Klue completed another Psychosocial Clinic Assessment (Tr. 309-11), noting that her services for Wigmore were discontinued for non-compliance. Tr. 308. Wigmore was 12-weeks pregnant and homeless. Tr. 309. She was seeking services to maintain her emotional stability, get her children back, become a good mother, obtain stable housing, and get Social Security Disability income. *Id*. Her stated long-term goal was to return to school and continue her education. *Id*. She was not taking any medications for her mental health issues due to her pregnancy, but reported previously taking Trazodone, Klonopin, and Zonisamide. *Id*. She denied using methamphetamine since 2006, but admitted a continuing struggle with her addiction. Tr. 310. She reported a voluntary hospitalization in 2004 due to stress when her children were taken from her custody. *Id*. Though she did not have stable housing, a driver's license or food stamps, she was otherwise taking good care of her personal needs and looked clean and neat in appearance. *Id*.

Wigmore and Klue continued to meet every two weeks to work primarily on Wigmore's housing goals. Tr. 303-08. During this time, Wigmore was struggling to have enough to eat and was hospitalized three times for pregnancy complications. *Id*.

On February 18, 2008, Wigmore reported that she had lost custody of her two children and planned to move to Oregon to live with her mother. Tr. 302. During their final visit on February 26, 2008, Wigmore reported to Klue that she had been hospitalized again due to pregnancy complications, but was still planning to move to Oregon once she got

clearance from her doctors.  Tr. 301.  In her closing summary dated February 29, 2008, Klue
noted that Wigmore suffered from major depressive disorder, recurrent, was not currently on
any medication due to her pregnancy, and during the course of treatment, had only moderate
improvement in her housing situation, no change in her educational goals or emotional
stability, and had lost custody of her children.  Tr. 300.

On May 15, 2008, Wigmore was evaluated by Becca Henry, PMHNP, at Peace
Health Behavioral Health Services in Eugene, Oregon.  Tr. 336-41.  Wigmore expressed her
desire to get back on her medications.  Tr. 336.  Her pregnancy had ended early on March
31, 2008, and her son was still in the NICU.  *Id*.  She reported that her mood was
"situational," but stabilizing as her son's condition began to improve.  *Id*.  She reported
"occasional" panic attacks, and while she may go two months without one, may have two in
one month depending on her life stressors.  *Id*.  She denied general anxiety but reported that
Ativan helped her relax and sleep.  *Id*.  Henry assessed a GAF of 65 and diagnosed
Wigmore with bipolar disorder, most recent episode depressed, moderate.  Tr. 340.  Henry's
treatment plan included stabilizing Wigmore's Depakote levels and encouraging the use of
relaxation techniques to cope with external stressors.  *Id*.

On June 24, 2008, Wigmore met with Henry again and reported feeling much more
stable, but with low-level situational anxiety tending to correlate to her newborn's health
issues.  Tr. 333.  Though Wigmore reported that she was taking her medication as
prescribed, her blood draw revealed low levels of medication in her system.  *Id*.  Wigmore
acknowledged that she was unmedicated for a few days while waiting for her prescription to
be filled.  *Id*.  She reported sleeping better, only taking Ativan about once a week rather

than daily, denied any panic attacks or pain since her last visit, and noted that she felt like she was nearly back to full functioning.  *Id.*

On September 16, 2008, Wigmore reported to Henry that she was stable even though she ran out of Depakote two weeks earlier.  Tr. 330.  She was hesitant to restart due to the intolerable side effects. *Id.*  Wigmore reported situational anxiety related to the health needs of her baby and feeling somewhat overwhelmed, but otherwise felt "carefree" and was managing her life well.  *Id.*  Though Henry agreed to try Lamictal instead of Depakote, Henry noted that Wigmore "abruptly discontinued her medication rather than calling the office upon running out[.]"  *Id.*

On October 10, 2008, Wigmore met with Rosa L. Barrington, DNP, at Peace Health Behavioral Health Services for treatment of back pain and bladder problems.  Tr. 377-78.  Barrington noted that Wigmore took daily ibuprofen well above the prescribed dosage.  Tr. 378.  Barrington assessed Wigmore as suffering from a urinary tract infection and low back pain secondary to lack of activity and weight gain.  *Id.*  Barrington counseled Wigmore on the appropriate use of Tylenol, prescribed Vicodin, Flexiril, heat, stretching, and ordered a blood test and MRI.  *Id.*  The MRI revealed "disc narrowing at L5-S1 and some reactive type changes of the endplate" with no evidence of infected discitis.  Tr. 379.

On October 21, 2008, Henry noted Wigmore's report of increased anxiety and decreased patience and frustration tolerance, due in part to increased external stressors of moving into her own apartment, preparing for her son's surgery, completing her outpatient treatment program, and communicating with DHS to have her case closed.  Tr. 327.  She experienced four panic attacks in the previous two weeks and several severe headaches since beginning Lamictal, but thought that the headaches were bearable as opposed to the

weight gain and sedation caused by Depakote. *Id*. Wigmore also admitted taking Vicodin regularly for chronic muscle and back pain. *Id*. Henry increased the Lamictal dose and prescribed Neurontin to help with pain, anxiety, and to augment mood stabilization. Tr. 328.

On October 27, 2008, Barrington noted that Wigmore's back pain was "severe" and that the MRI revealed lumbar spondylosis at L5-S1, which likely reflected "fairly severe" end plate degenerative change. Tr. 374. Barrington assessed Wigmore with chronic recurrent pain with disc degeneration, counseled her on home physical therapy exercises, and told her not to take more than two Vicodin and four Aleve a day. *Id*.

On November 11, 2008, Wigmore reported feeling more like herself, and Henry noted good medication compliance. Tr. 324-25. Wigmore's sleep, energy, and mood had improved. Tr. 324. Henry adjusted the Neurontin dosage to improve pain and anxiety and otherwise continued the treatment plan. Tr. 325.

On January 8, 2009, Wigmore reported that she suffered three panic attacks in the previous week, as well as increased anxiety and increased back pain caused by carrying her son and heavy luggage during holiday travel. Tr. 321. Henry noted that Wigmore was clean, well-groomed, calm, cooperative, had good eye contact, goal-directed thought process, and good insight and judgment. Tr. 322. Henry continued the treatment plan with a slight increase in Neurontin to improve pain and anxiety. *Id*.

On January 30, 2009, Wigmore told Barrington that her pain was much better. Tr. 371-73. Barrington observed that Wigmore was "overall, doing well" and taking one to two Vicodin a day and Flexeril "here and there" as needed. Tr. 372. Barrington continued Wigmore's Vicodin and Flexeril prescriptions. *Id*.

9 - FINDINGS AND RECOMMENDATION

On April 27, 2009, Barrington continued Wigmore on her current pain management program for her degenerative disc disease and renewed her Vicodin and Flexeril prescriptions.  Tr. 368-70.

On June 4, 2009, Wigmore reported to Henry that she had spent three months out of town with her mother when she was unable to refill her medications.  Tr. 318.  She reported going off all of her medications for two months and restarting them two months ago.  *Id*.  She reported average pain which improved after restarting her medications (Lamictal and Neurontin), but still continued to experience irritability and decreased frustration tolerance.  *Id*.  Henry observed that Wigmore "abruptly discontinued all of her medications without calling any prescribers" and that her report of slowly getting back to her full Lamictal dose was "inconsistent with the time frame she reported."  Tr. 319.

On July 9, 2009, Wigmore reported that she felt more stable, but her pain was worse than ever.  Tr. 315.  She continued to experience frequent crying spells and daily anxiety, though her anxiety had abated somewhat since she began leaving the house more often.  *Id*.  She reported experiencing panic attacks approximately three times a week, which was down from once a day.  *Id*.  She reported suffering from degenerative disc disease, and Henry observed that her breathing was labored and that she was distracted, wincing, and appeared to be "in obvious distress."  *Id*.  Henry increased the Neurontin dose and otherwise continued the treatment plan.  Tr. 316.

On July 14, 2009, at a quarterly chronic pain management visit, Barrington noted that she had recently referred Wigmore for possible injection or surgical intervention for her desiccated disc, but her insurance did not cover these procedures.  Tr. 366.  Wigmore reported that her back pain was getting worse, and Barrington noted that she was "quite

10 - FINDINGS AND RECOMMENDATION

guarded as she always is in her visits." *Id*.  Barrington allow an additional daily dose of Vicodin, but advised Wigmore to try not to take it every day.  *Id*.  Though Barrington believed Wigmore's pain complaints, she stressed weight loss and back stretching exercises in order to relieve the pain.  Tr. 366-67.  Barrington prescribed Vicodin, Flexeril, and Naprosyn.  Tr. 367.

During her next visit with Barrington on November 2, 2009, Wigmore reported that she was doing well on her current medication regime and was well within her pain contract parameters.  Tr. 362-64.  Because Wigmore was "doing well" overall, Barrington renewed the Vicodin, Flexeril, and Naproxen prescriptions and prescribed a 12-week Vitamin D regime and simvastatin for hyperlipidemia.  Tr. 363.

On February 17, 2010, Ronald D. Duvall, Ph.D., conducted a psychological examination at the request of DDS.  Tr. 346-50.  Dr. Duvall set forth a detailed summary of Wigmore's history and his own personal observations.  Tr. 346-50.  He expressed serious concerns regarding Wigmore's reliability based on the many discrepancies in the records from the Ozark Clinic and Peace Health Behavioral Health Services regarding Wigmore's self-reports of her drug use, psychiatric history, and hospitalizations.  Tr. 347-48.  Dr. Duvall noted that these discrepancies cast doubt on Wigmore's self-report, the accuracy of her diagnosis, and the degree to which she reported being functionally disabled from that diagnosis.  Tr. 348.  He assessed a GAF of 55 and diagnosed bipolar disorder, panic disorder (mild-moderate), and personality disorder nonspecified with antisocial traits.  Tr. 350-51.  He concluded that "[b]ased solely on her normal [mental status exam] today," Wigmore "is cognitively capable of working at some job within her intellectual and physical

11 - FINDINGS AND RECOMMENDATION

abilities," but could not determine her actual diagnosis due to the multiple discrepancies.
*Id*.

Dr. Duvall also completed a Medical Source Statement regarding Wigmore's mental capacity to perform work-related tasks. Tr. 343-45. After a review of Wigmore's mental health treatment records, a 90-minute observation, and a mental status exam, Dr. Duvall concluded that Wigmore has normal cognitive function and no restrictions in her ability to understand, remember, or carry out simple or complex instructions or to make judgments on simple or complex work-related decisions. Tr. 343-44. He concluded that Wigmore has moderate limitations in her ability to interact appropriately with the public, supervisors, co-workers, and in responding appropriately to usual work situations and to changes in a routine work setting. Tr. 344. Finally, due to Wigmore's severe history of methamphetamine abuse and "the possibility of deception during today's examination," he stated that he did not believe that it would be in Wigmore's best interest to permit her to manage her own benefits. Tr. 345.

After Wigmore's quarterly pain management visit on February 18, 2010, Barrington completed a Medical Source Statement regarding Wigmore's physical capacity to perform work-related tasks. Tr. 354-58, 361. Barrington noted that Wigmore was current on her Flexeril and Vicodin prescriptions, compliant with her medication contract, had "excellent control" of her hyperlipidemia, but had not lost any weight because her back pain prevented her from exercising. Tr. 361. Barrington concluded that Wigmore could lift and/or carry 25 pounds frequently, 25 pounds occasionally, stand and/or walk continuously for 30 minutes without a break, stand and/or walk throughout an eight-hour work day with usual breaks for less than one-hour, sit continuously for 30 minutes at a time without a break, and need to

alternate sitting and standing every 30 minutes throughout an eight-hour work day.  Tr. 355.

She should never climb or balance and should only occasionally stoop, kneel, crouch, crawl,

reach, handle, finger, feel, see, speak, or hear.  Tr. 356.  She should avoid moderate

exposure to extreme heat and cold, wetness, humidity, dust, and fumes, and avoid

concentrated exposure to weather, vibration, hazards, and heights.  *Id*.  Barrington deferred

all mental functioning to a qualified mental health provider.  Tr. 357-58.

On August 10, 2010, John H. Ellison, M.D., completed a comprehensive

musculoskeletal exam and a Medical Source Statement regarding Wigmore's physical

capacity.  Tr. 387-98.  Dr. Ellison concluded that Wigmore suffers from chronic lumbar and

right leg pain, spondylosis, degenerative disc disease, bipolar disorder, social anxiety and

panic disorders, knee pain, and obesity.  Tr. 392.  Consequently, Wigmore could lift up to

20 pounds occasionally and up to 10 pounds frequently, and could occasionally carry up to

10 pounds.  *Id*.  She could sit for 30 minutes at a time for a total of eight hours, stand for 30

minutes at a time for a total of two hours, and walk for 15 minutes at a time for a total of

one hour.  Tr. 393.  She could frequently use her hands to reach, handle, finger, feel, and

push/pull, though she should never operate foot controls, climb stairs, ramps, ladders, or

scaffolds, balance, stoop, kneel, crouch, or crawl.  Tr. 394-95.  She should never be exposed

to unprotected heights and should only occasionally operate a motor vehicle or be exposed

to moving mechanical parts, humidity, wetness, dust, odors, fumes, extreme cold or heat, or

pulmonary irritants.  Tr. 396.  Due to her physical impairments, she could not perform

activities like shopping, walking a block at a reasonable pace on rough or uneven surfaces,

or climbing a few steps at a reasonable pace with the use of a single hand rail, though she

can ambulate without an assistive device, use standard public transportation, prepare a

simple meal to feed herself, care for her personal hygiene, and sort, handle, or use paper files. Tr. 397.

On September 14, 2010, at the ALJ's request, Susan Bottomley, OTR, performed a Physical Capacity Level II Consultative Examination. Tr. 236, 401-08. Wigmore reported low back pain at all times, including pressure in both lower extremities "like wearing tight spandex" and "burning pain down the back of her right leg that feels like a shock" and "comes and goes." Tr. 402. When she awakes, the pain is excruciating, but becomes bearable once she takes her pain medication. *Id*. Wigmore reported that she does not feel she can work due to the combination of back pain and mental health issues, which includes panic attacks when she leaves the house. Tr. 403. During the physical examination, Wigmore presented with pain behaviors that included moaning and grimacing; she reported feelings of anxiety and stated that she was having a panic attack. *Id*. Her blood pressure, taken three times with at least five minutes between each test, "exceed[ed] clinic criteria for functional capacity testing." *Id*. Because Wigmore was unable to complete the physical capacity testing due to the high blood pressure, Bottomley relied solely on the defined lumbar spine condition. Tr. 404-06.

Bottomley concluded that Wigmore would be capable of "at least light work," could carry or lift 10 pounds frequently to continuously, carry or lift 20 pounds occasionally, but should avoid frequent bending, stooping, and twisting. Tr. 405-06. Any other restrictions in sitting, standing, walking, climbing, crouching, crawling, reaching, kneeling, pushing, pulling, or bending are "related to deconditioning and mental health issues affecting motivation and pain perception," not to her lumbar spine condition. *Id*. Moreover, Bottomley concluded that any limitations related to Wigmore's ability to carry out at least

full-time light work cannot be explained on the basis of her lumbar condition, but rather are likely related to the fact that she is "deconditioned and has a long history of mental health issues that affect her ability to maintain physical fitness," and because "[d]epression can increase the subjective pain experience." Tr. 406.

On November 8, 2010, Susan L. Dragovich, Ph.D, conducted a Psychological Evaluation of Wigmore at her attorney's request. Tr. 414-19. After an extensive recitation of Wigmore's history and account of her activities of daily living, a mental status exam, and administration of the MMPI-2, Dr. Dragovich provided a detailed summary of her clinic observations and assessments of Wigmore's functioning. *Id*. Dr. Dragovich concluded that Wigmore suffers from bipolar disorder which appears controlled by psychotropic medication. Tr. 418. Wigmore also suffers from panic attacks which are not completely managed by medications. *Id*. Dr. Dragovich further opined that Wigmore's panic attacks and anxiety would disrupt her work in an "unpredictable manner" and that she would not be able to work in a service capacity or with more than just a few co-workers. *Id*. Though she might be able to work with objects, she would likely have 20-30 minute disruptions several times a week, as well as whatever physical limitations associated with her degenerative disc disease. *Id*. In Dr. Dragovich's opinion, Wigmore's employability would increase after she has engaged in a couple of years of therapy and medication management. *Id*. She did not share Dr. Duvall's concerns about Wigmore's lack of reliability. *Id*. Dr. Dragovich concluded that Wigmore's activities of daily living and social functioning are moderately limited; her concentration, persistence, and pace are markedly limited as she now functions; and she would likely decompensate if forced to leave her home on a daily basis for work activity. *Id*.

15 - FINDINGS AND RECOMMENDATION

II.    **Wigmore's Testimony**

On September 18, 2007, Wigmore completed an Adult Function Report.  Tr. 200-07.
At that time, she was living with friends and described her typical day as consisting of
getting up, taking her medications, drinking coffee, and trying to focus on the day.  Tr. 200.
Her parents usually called around 8:30-9:00 a.m. to remind her of appointments.  *Id*.
Though she was able to perform her own self-care tasks and also take care of her dog, she
often needed reminders.  Tr. 201.  Before her illness, she had friends and was able to better
remember things.  *Id*.  She prepared her own meals and did household chores and yard work,
but sometimes forgot what she was doing and got frustrated.  Tr. 202.  She never went
outside except to a doctor's or other appointment because of panic attacks.  Tr. 2013.  When
she did leave the house, she did not drive herself or go alone.  *Id*.  She did not do her own
shopping and felt flustered handling money.  *Id*.  She expressed difficulty getting along with
friends, neighbors, and others, but not with her family.  Tr. 205.  She had difficulty talking,
seeing, remembering, concentrating, understanding, following instructions, getting along
with others, and did not handle stress or changes in routine well.  Tr. 205-06.

At the hearing held on January 11, 2010,[4] Wigmore testified that she last worked for
approximately one month at a cereal factory, sometime between 2006 and 2008.  Tr. 62-63.
She was unable to work due to her panic attacks.  Tr. 63-64.  She reported suffering panic
attacks two to three times a week which last anywhere from 10 to 90 minutes.  Tr. 65.  Some
of the symptoms tend to decrease after 10-15 minutes if she lays down and gets away from
people.  *Id*.  She stayed in the house "most of the time" because she will "just freak out

---

[4]  Wigmore testified at the supplemental hearing on December 3, 2010, but only in response to questions by
the VE and the ALJ about her work history.  See Tr. 43-44, 48.  Wigmore did not otherwise offer any
additional testimony regarding her symptoms.  Tr. 41.

around people." Tr. 66. She had daily crying spells that "could last hours" and some days did not feel like getting out of bed. Tr. 67-68. Though she lived alone with her 21-month old son, her mother helped with errands such as going to the grocery store, and often came over to help with her son when Wigmore experienced a panic attack. Tr. 61, 66. Once or twice a week, Wigmore's mother also helped around the house, though Wigmore was "pretty good" about picking up the house, keeping the dishes done, changing the baby's diaper, and taking care of other household tasks. Tr. 69.

Wigmore testified that she had trouble concentrating on tasks like reading a book or magazine. Tr. 67. She struggled to focus long enough to "get through a two column article," but she remembered to take her medicines because they sat on her microwave in plain sight. *Id.* At the time of the hearing, she was taking Ativan, Abilify, Lamictal, Gabapentin, Vicodin, Flexiril, and Vitamin D. Tr. 64. Medication side effects include fatigue, dizziness, weight gain, and confusion. Tr. 68-69. She took at least two naps a day, and often could not get off the couch after taking her medication in the morning. Tr. 70.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner

meets this burden, then the claimant is not disabled.  20 CFR §§ 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Wigmore has not engaged in substantial gainful activity since August 23, 2007, the date that the application was protectively filed.  Tr. 13. At step two, the ALJ determined that Wigmore has the severe impairments of degenerative disc disease of the lumbar spine, obesity, elevated blood pressure, personality disorder NOS, and a history of bipolar disorder, panic disorder, and polysubstance abuse.  *Id.*

At step three, the ALJ concluded that Wigmore does not have an impairment or combination of impairments that, either singly or in combination, meets or equals any of the listed impairments.  Tr. 13-14.

Because Wigmore did not establish disability at step three, the ALJ continued to evaluate how her impairments affect her ability to work.  The ALJ concluded that Wigmore has the RFC to:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She can walk 15 minutes at a time for a total of one hour in an eight-hour workday, stand 30 minutes at a time for a total of at least two hours in an eight-hour workday, and sit 30 minutes at a time for a total of eight hours in an eight-hour workday.  The claimant requires a brief change of position, lasting no more than two minutes, every half-hour.  She can climb stairs/ramps, balance, stoop, kneel, crouch, and crawl occasionally, but she cannot climb ladders, ropes, or scaffolds. The claimant can perform routine, repetitive tasks consistent with unskilled work (SVP 2) in the DOT; however, this work should not require more than occasional/brief contact with the public and coworkers.  She should not work at unprotected heights or [with] moving machinery due to the possibility of relapse into substance abuse.

Tr. 14.

At step four, the ALJ determined that Wigmore had no past relevant work.  Tr. 20.

At step five, the ALJ found that considering Wigmore's age, education, and RFC, she was

capable of performing three jobs identified by the VE that exist in significant numbers in the

national economy.  Tr. 21.

Accordingly, the ALJ determined that Wigmore was not disabled at any time

between the date of application, August 23, 2007, and the date of his decision, January 7,

2011.  Tr. 11, 21.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record.  42

USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the

evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504

F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).

The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v.

Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481

F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir

2001).  Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn

from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson

v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*,

504 F3d at 1035.

## FINDINGS

Wigmore argues that the ALJ erred in forming Wigmore's RFC because he improperly evaluated the medical evidence and failed to properly assess the impact of her obesity and elevated blood pressure on her ability to work.  Wigmore also alleges that the ALJ improperly relied on VE testimony that was inconsistent with the Dictionary of Occupational Titles ("DOT").

## I.    RFC Assessment

### A.    Medical Evidence

Wigmore contends that the ALJ erred in his evaluation of the medical evidence.  Specifically, Wigmore argues that the ALJ:  (1) failed to incorporate all the restrictions set forth by the examining physicians, Dr. Duvall and Dr. Ellison, even though he gave these opinions the greatest weight; (2) ignored evidence from Wigmore's other treating sources; and (3) failed to give appropriate explanations of the medical evidence relied upon in determining the RFC.

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See Batson*, 359 F3d at 1195 (citation omitted).  In weighing a claimant's medical evidence, the ALJ generally affords enhanced weight to the opinion of the claimant's treating physicians if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other substantial evidence in the record.  20 CFR § 416.927(c)(2).  "Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships."  *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F3d 1155, 1164 (9th Cir 2008) (citation omitted).  In consequence, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing"

reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick*, 157 F3d at 725, citing *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). Moreover, several factors determine the weight the ALJ should give to a physician's opinion, including the length of the treatment relationship and frequency of examination, the amount of evidence that supports the opinion, the consistency of the medical opinion with the record as a whole and the physician's specialty and understanding of the disability program. *Orn v. Astrue*, 495 F3d 625, 631-632 (9th Cir 2007), citing 20 CFR § 404.1527(d)(2).

Similarly, the ALJ is "not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability" if he gives clear and convincing reasons for rejecting those opinions. *Reddick*, 157 F3d at 725, quoting *Montijo v. Sec'y of Health & Human Servs.*, 729 F2d 599, 601 (9th Cir 1984). "A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record. In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Id* (citation omitted). When "the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'" *Lester*, 81 F3d at 834, quoting *Hammock v. Bowen*, 879 F2d 498, 502 (9th Cir 1989).

### 1.    Dr. Duvall and Dr. Ellison

The ALJ relied most heavily on the opinions of two examining physicians in forming Wigmore's RFC: Dr. Duvall for the mental portion and Dr. Ellison for the physical portion. Wigmore contends that the ALJ erred by failing to incorporate all of the restrictions set

forth by these physicians and to provide adequate explanations for those restrictions he rejected.

First, with regard to Wigmore's mental RFC, the ALJ concluded that Wigmore could "perform routine, repetitive tasks consistent with unskilled work," but that "this work should not require more than occasional/brief contact with the public and coworkers." Tr. 14. In setting forth these limitations, the ALJ found Dr. Duvall's assessment of Wigmore's mental functioning to be "the most consistent with the overall evidence of record" and, therefore, gave it "the greatest weight." Tr. 17. The ALJ specifically noted Dr. Duvall's conclusion that despite Wigmore's diagnosed history of bipolar, panic, and personality disorders, she had "no limitation in her ability to understand, remember, or carry out instructions," but, as characterized by the ALJ, "would have moderate [limitations] in all other areas of social interaction." Tr. 16-17.

Wigmore appears to contend that the ALJ erred by not specifically mentioning Dr. Duvall's conclusion of moderate limitations in three specific areas of social functioning: (1) the ability to interact appropriately with supervisors, coworkers, and the public; (2) responding appropriately to usual work situations; and (3) responding appropriately to changes in a routine work setting. Tr. 344. According to Wigmore, it was legal error for the ALJ to ascribe limitations to her ability to interact with supervisors, the public, and coworkers, but to ignore her moderate limitations in her ability to respond appropriately to usual work situations and changes in a routine work setting. Wigmore takes the position, without citing any authority, the ALJ may ignore "mild" restrictions without explanation, but must include all "moderate" restrictions ascribed by an examining physician in the RFC or provide a detailed explanation for not including them. Notwithstanding Wigmore's

argument to the contrary, the ALJ did not completely ignore Wigmore's limitation in these areas.  Instead, the ALJ twice pointed out Dr. Duvall's finding that Wigmore had moderate limitations in social functioning.  Tr. 17 (noting that "Dr. Duvall did find that the claimant would have moderate [limitations] in all areas of social functioning," and that Wigmore's reports of "occasional irritability . . . [is] consistent with Dr. Duvall's finding of moderate social limitations.").

The ALJ did not specifically include Dr. Duvall's conclusion that Wigmore has moderate restrictions in her ability to respond appropriately to usual work situations and to changes in routine work settings.  Dr. Duvall checked the box on the Medical Source Statement form indicating a moderate restriction in these areas, but did not otherwise discuss them.  An ALJ may reject check-off reports from physicians that do not contain any explanation of the bases for the conclusions.  *See Crane v. Shalala*, 76 F3d 251, 253 (9th Cir 1996).

Moreover, Dr. Duvall noted in his detailed narrative that Wigmore's statements regarding her abilities to perform work-related tasks was so unreliable that it was nearly "impossible" for him accurately assess the severity of her limitations.  Tr. 350.  The ALJ noted and gave great weight to Dr. Duvall's impressions and opinion regarding Wigmore's reliability, ultimately finding her testimony not credible, especially regarding the limitations imposed by her alleged impairments.  Tr. 20.  Wigmore does not challenge the ALJ's credibility finding.  It is well-established that an ALJ is not required to take into account those limitations that depend on a claimant's subjective complaints, especially where the ALJ finds the claimant less than credible.  *Bayliss v. Barnhart*, 427 F3d 1211, 1217 (9th Cir 2005).

24 - FINDINGS AND RECOMMENDATION

Because the ALJ rejected Wigmore's testimony regarding the severity of her limitations and because he afforded great weight to Dr. Duvall's impressions regarding Wigmore's ability to function, it was not legal error to fail to specifically include a limitation regarding her social functioning in the areas of responding appropriately to usual work situations and to changes in routine work settings. The ALJ's RFC adequately took into account Wigmore's social functioning limitations as supported by the record as a whole.

Second, with regard to Wigmore's physical RFC, the ALJ erroneously reported that Dr. Ellison "assessed [Wigmore] as having the capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently." Tr. 19. Dr. Ellison actually concluded that Wigmore could only occasionally carry up to 10 pounds. Tr. 392. The Commissioner concedes that this portion of the RFC was erroneous,[5] and if the RFC and resulting hypothetical properly reflected that Wigmore could lift and/or carry no more than 10 pounds occasionally, then she would have been limited only to sedentary work. However, the Commissioner contends that because the ALJ ultimately concluded that Wigmore was capable of performing two sedentary occupations, the error was harmless.

"[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was not inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Robbins v. Social Sec. Admin.*, 466 F3d 880, 885 (9th Cir 2006). Even though the

---

[5] Even if the Commissioner did not concede this error, substantial evidence exists that Wigmore can lift or carry this weight. Barrington, one of Wigmore's treating sources, opined that Wigmore could lift or carry 25 pounds frequently. Tr. 355. Bottomley, the consulting occupational therapist, opined that Wigmore was capable of "at least full-time light work" and could likely carry or lift 10 pounds frequently and could carry or lift 20 pounds occasionally. Tr. 405.

RFC did not accurately reflect the ALJ's assessment of Wigmore's ability to lift and carry more than 10 pounds, this error is harmless.  Even crediting Dr. Ellison's testimony as true, Wigmore would have been limited to sedentary work.  The ALJ ultimately concluded that Wigmore is not disabled because she can perform two sedentary occupations.  Tr. 21.  Consequently, the "ALJ's decision remains legally valid, despite" the error.  *Carmickle*, 533 F3d at 1162.

### 2.    Other Treating Sources

Wigmore contends that the ALJ erred because he was impermissibly biased regarding the evidentiary value of the medical evidence offered by her treating sources.  In support, she quotes the ALJ's statements at the first hearing that the record contained no evidence from any acceptable medical sources that would support a disability finding.  Tr. 70-72.  It is well-established that a diagnosis from an acceptable medical source is a prerequisite to finding that a medically determinable impairment exists.  20 CFR § 416.913(a); SSR 06-03p, 2006 WL 2329939 (August 9, 2006).  Rather than concluding that Wigmore was not disabled on this basis, the ALJ ordered a psychological evaluation at the agency's expense, after which he held a second hearing.  Tr. 38-53, 72.  Thus, the ALJ's comments at the first hearing fail to prove any pre-determined disposition against probative evidence.  Instead, the ALJ attempted to obtain the necessary diagnosis from an acceptable medical source.  Wigmore has presented no other evidence "that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment."  *Bayliss*, 427 F3d at 1214-15 (internal citation and quotation omitted).  Consequently, Wigmore has failed to establish that the ALJ was so impermissibly biased that he did not render fair judgment.

26 - FINDINGS AND RECOMMENDATION

Wigmore also argues that the ALJ's statements reveal his bias against the opinions offered by her treating sources.  Acceptable medical sources are licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists.  20 CFR § 416.913(a).  Although Wigmore had treating relationships with several sources, they are all "other" medical source for purposes of the disability analysis.  *See Molina v. Astrue*, 674 F3d 1104, 1111 (9th Cir 2012).  The medical record includes notes from several treating sources at the Ozark Center in Missouri, including Coomer (RN/CNS), Rob Ballard (unknown credentials), Tanya Klue (BS), and an unknown source who signed the treatment records from May 12, 2006, to November 27, 2007.[6]  After moving to Oregon in March 2008, Wigmore began seeing Henry (PMHNP) and Barrington (DNP) at Peace Health Behavioral Health Services.  None of these providers are acceptable medical sources. 20 CFR § 416.913(a).  Consequently, any opinions rendered by these sources are not medical opinions.  20 CFR § 416.927(a)(2).

Nevertheless, an opinion from such a source may be used to evaluate the severity of a claimant's impairment and how it affects his or her ability to work.  20 CFR § 416.913(d); SSR 06-03p.  These sources may offer opinions regarding a claimant's symptoms, diagnosis, prognosis, and what a claimant can still do despite her impairments.  SSR 06-03p.  In order to reject such testimony, an ALJ must give a germane reason.  *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F3d 1217, 1224 (9th Cir 2010).

---

[6] According to Wigmore, the unsigned treatment notes were authored by "Dr. Collins" whom she saw for medication management after she stopped seeing Coomer.  Tr. 275.  The record contains no information about Dr. Collins' credentials.  Even if it did, Wigmore does not contend that this provider, or any of her other treating providers, were acceptable medical sources, but rather contends that the ALJ inappropriately discounted their opinions.

While the record contains treatment notes and diagnoses from each of Wigmore's treating providers, only Barrington rendered an opinion on the severity of Wigmore's alleged impairments and their impact on her ability to perform work-related tasks.  On February 18, 2010, Barrington completed a Medical Source Statement ascribing various limitations on Wigmore's physical ability to perform tasks such as lifting, carrying, standing, walking, sitting, climbing, stooping, kneeling, crouching, reaching, handling, fingering, seeing, speaking, and hearing.  Tr. 355-56.  The ALJ gave "little weight" to Barrington's opinion in part because the limitations she assessed were not supported by her own objective medical findings.  Tr. 19.  Contradiction with medical evidence is a germane reason to discount the opinion of a lay witness.  *See Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001), citing *Vincent v. Heckler*, 739 F2d 1393, 1395 (9th Cir 1984).

Additionally, the ALJ discounted Barrington's opinion because she did not address Wigmore's symptom exaggeration, failure to follow Barrington's advice regarding weight loss and back strengthening exercises, and report of inconsistent activities.  Tr. 19.  The ALJ cited these same reasons for finding Wigmore less than credible (Tr. 20), a finding which Wigmore does not contest.  An ALJ may discount a medical opinion if based "to a large extent" on claimant's self-reports that have been properly discredited.  *Tommasetti*, 533 F3d at 1041.  Thus, the ALJ's rejection of Barrington's opinion was proper.

The remaining treatment providers did not ascribe any work-related limitations, but did opine as to Wigmore's symptoms and diagnosis.  The ALJ rejected these opinions because they were not consistent with the overall medical record and Dr. Duvall's opinion.  Tr. 17.  Dr. Duvall is an "acceptable medical source" under 20 CFR § 416.913(a) and, therefore, is properly accorded greater weight than the opinion of "other" sources.  *Gomez v.*

*Chater*, 74 F3d 967, 970 (9th Cir 1996). Contradiction with medical evidence is a germane reason for rejecting opinion evidence from a source other than an acceptable medical source. *See Lewis*, 236 F3d at 511, citing *Vincent*, 739 F2d at 1395. Consequently, the ALJ offered germane reasons for rejecting the opinions of Wigmore's non-acceptable medical source providers.

### 3.    Lack of Explanation

The remainder of Wigmore's objections regarding the ALJ's evaluation of the medical evidence center upon how the ALJ explained (or failed to explain) his reasoning for adopting the RFC. Specifically, Wigmore contends that the ALJ failed to: (1) identity what medical evidence he relied upon in forming the RFC; (2) explain how the medical evidence supported the limitations included in the RFC; and (3) provide a narrative discussion that cited specific medical facts and non-medical evidence that supported each of the RFC limitations.

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion and citing both medial and nonmedical facts. SSR 96-8p, 1996 WL 374184 (July 2, 1996). A reviewing court "will affirm the ALJ's determination of [the claimant's] RFC if the ALJ applied the proper legal standard and [the] decision is supported by substantial evidence." *Bayliss*, 427 F3d at 1217. An ALJ is not required to perform a function-by-function analysis prior to determining a claimant's RFC, so long as the ALJ takes into account those limitations supported by the record and not dependent upon the claimant's subjective complaints. *Id*. Similarly, an ALJ is not required to perform such an analysis for medical conditions for which the ALJ found neither credible nor supported by the record. *Id*.

Here, the ALJ's RFC is supported by a lengthy narrative statement which discusses virtually all of Wigmore's medical history, beginning with her treatment records at the Ozark Center predating her alleged onset date.  Tr. 15-19.  Even though much of the record consisted of treatment records from non-acceptable medical sources, the ALJ nonetheless discussed these records, the providers' diagnoses and observations, and Wigmore's self-reports of her symptoms. With the exception of the harmless error regarding Wigmore's ability to lift and/or carry more than 10 pounds, the ALJ properly accounted for Wigmore's limitations and specifically discussed the medical and nonmedical evidence supporting these limitations.  Consequently, reversal or remand on the basis of the ALJ's discussion of the medical evidence is not warranted.

## B.    **Obesity and High Blood Pressure**

Wigmore contends that the ALJ erred by failing to account for her obesity and high blood pressure in her RFC.  The RFC assessment describes the work-related activities a claimant can still perform on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments.  20 CFR § 416.945(a); SSR 96-8p.  The ALJ must reach the RFC assessment based on all the relevant evidence in the case record, including medical reports and the effects of symptoms that are reasonably attributable to a medically determinable impairment. *Robbins*, 466 F3d at 883.  The ALJ, however, need not incorporate limitations identified through claimant testimony or medical opinions that the ALJ permissibly discounted.  *Batson*, 359 F3d at 1197.

The ALJ considered Wigmore's obesity a severe impairment, but did not otherwise reference this impairment or any work-related limitations attributed to this impairment.  The regulations require only that an ALJ consider obesity and its effects when evaluating other impairments.  SSR 02-01p, 2002 WL 34686281 (Sept. 12, 2002).  "Obesity in combination with

another impairment may or may not increase the severity or functional limitations of the other impairment.  [An ALJ] will evaluate each case based on the information in the case record."  *Id* at * 6.  "An ALJ is not required to discuss 'the combined effect of a claimant's impairments,' including obesity, 'unless the claimant presents evidence in an effort to establish equivalence.'" *Lowe v. Astrue*, Civil No. 10-0904-MO, 2011 WL 4345168, at *4 (D Or Sept. 15, 2011), quoting *Burch v. Barnhart*, 400 F3d 676, 683 (9th Cir 2005).

Wigmore does not assert any functional limitations arising from her obesity, nor does she cite any medical evidence that obesity has caused any functional limitations.  A review of the record reveals that the primary evidence regarding Wigmore's obesity is from Barrington who often noted that Wigmore needed to lose weight to relieve her back pain and that the back pain was "secondary to lack of activity and weight gain."  Tr. 361, 366-67, 378.   Dr. Ellison noted that Wigmore was obese, but did not otherwise discuss the impact of this diagnosis.  Tr. 392. There is no evidence that Wigmore suffered any work-related restrictions due to obesity.  With the exception of Barrington's notes indicating that Wigmore must lose weight to relieve her back pain, the record reveals no evidence that her obesity exacerbated her other impairments.  Due to the absence of evidence in the record that Wigmore's obesity caused any functional limitations, the ALJ did not err by failing to further discuss how Wigmore's obesity impacted her ability to work.

The ALJ also considered Wigmore's elevated blood pressure as a severe impairment but did not otherwise discuss the impairment or ascribe any work-related limitations.  Elevated blood pressure is mentioned only once in the record.  On September 14, 2010, Bottomley noted that Wigmore's blood pressure was so high that she was unable to complete the physical capacity testing that day.  Tr. 403.  Bottomley then assessed Wigmore's physical RFC based only on her

lumbar spine condition and did not mention any limitations or even a diagnosis related to the high blood pressure. Tr. 401-08. Wigmore does not cite to, and the court did not find, any other notes about elevated blood pressure or a diagnosis of hypertension anywhere in the lengthy medical record. At the hearing the ALJ asked Wigmore whether she was taking any medication or otherwise receiving treatment for high blood pressure. Tr. 48. Wigmore responded that she was not. *Id*. Just because the ALJ determined that elevated blood pressure was a severe impairment, he did not also have to ascribe workplace limitations, especially where the record is completely devoid of any limitations. Thus, the ALJ did not err by failing to incorporate restrictions related to elevated blood pressure in Wigmore's RFC.

### C.    Conclusion

The ALJ's RFC assessment reflects a detailed analysis of the evidence as a whole. The ALJ made his RFC finding after reviewing all the evidence in the record, specifically addressing the opinions of acceptable medical sources and Wigmore's treating providers, the general medical record, the objective evidence, as well as Wigmore's testimony regarding the severity of her limitations. Though the RFC was partially inaccurate regarding the amount of weight Wigmore could lift or carry, this error was harmless. Had the ALJ properly set forth Wigmore's ability to lift or carry, she would have been limited to sedentary work and able to perform two of the three jobs identified by the VE. The RFC is otherwise supported by substantial evidence in the record. The ALJ properly took into account those limitations for which there was support in the record and that did not interfere with her ability to work. Because the ALJ properly formulated Wigmore's RFC, reversal or remand is not warranted on this basis.

///

///

II.    **VE Testimony**

At step five, the Commissioner must show that the claimant can do other work which exists in the national economy.  *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995).  The Commissioner can satisfy this burden by eliciting the testimony of a VE regarding what jobs the claimant would be able to perform, given her RFC.  *Tackett*, 180 F3d at 1101.  Wigmore does not take issue with the hypothetical given to the VE but, rather, contends that the VE's testimony contradicts information contained in the DOT.

The DOT is presumptively authoritative regarding job classifications, but that presumption is rebuttable.  *Johnson v. Shalala*, 60 F3d 1428, 1435 (9th Cir 1995).  The ALJ must ask the VE if his testimony is consistent with the DOT; if the VE's testimony conflicts with the DOT, the ALJ "must elicit a reasonable explanation for the conflict" before relying on the VE's testimony to support a determination about the claimant's disability.  SSR 00-4p, 2000 WL1898704, at *2 (Dec. 4, 2000); *see also Massachi v. Astrue*, 486 F3d 1149, 1153-54 (9th Cir 2007).

In response to a question by the ALJ, the VE responded that his testimony was consistent with the DOT, except for where he "reduced the numbers" on the bench assembler job to reflect the limitations regarding Wigmore's ability to sit or stand.  Tr. 49, 51.  Wigmore does not contest this portion of the VE's testimony, but contends that all three jobs identified by the VE require the operation of moving machinery which the ALJ explicitly excluded from the hypothetical.  Tr. 49 (Wigmore "should not be exposed to hazards in the work place.  That would include . . . *moving or otherwise dangerous machinery*.") (emphasis added).  The critical issue is whether a conflict exists between the VE's testimony and the DOT.

Based on the hypothetical given by the ALJ, the VE identified three occupations that Wigmore could perform given her RFC:  (1) bench assembler, DOT § 706.684-022, 1991 WL 679050; (2) eyeglass frame polisher, DOT § 713.684-038, 1991 WL 679267; and (3) stuffer, DOT § 731.685-014, 1991 WL 679811.  As noted above, the ALJ inaccurately stated Wigmore's ability to lift and carry more than 10 pounds in the RFC.  Thus, only the two sedentary occupations of eyeglass frame polisher and stuffer are consistent with her actual RFC.

The description of an eyeglass frame polisher includes the use of a "polishing wheel" machine, and the description of the stuffer requires tending a "machine."  1991 WL 679267 (eyeglass frame polisher); 1991 WL 679811 (stuffer).  However, both DOT descriptions also specifically state that "moving mechanical parts" are "not present" for these occupations.  *Id.* The ALJ's hypothetical to the VE limited the use of "moving or otherwise dangerous machinery," as opposed to "machines" or "machinery" generally.  The mere fact that the two occupations require the use of a machine does not render the VE's testimony inconsistent with the limitations in the hypothetical, especially in light of the DOT descriptions which specifically exclude the use of "*moving* mechanical parts."

Because there is no conflict between the VE's testimony and the DOT with respect to the sedentary occupations of eyeglass polisher and stuffer, the ALJ did not err by relying on this testimony in concluding that that Wigmore was capable of performing jobs that exist in significant numbers in the national economy.  Reversal or remand is not warranted on this basis.

## **RECOMMENDATION**

For the reasons discussed above, the Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Friday, May 03, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED April 16, 2013.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

35 - FINDINGS AND RECOMMENDATION